28 C.C.P.A.(Patents)

SAUNDERS v. BROWNE.

Patent Appeal No. 4374.

Court of Customs and Patent Appeals.

Feb. 17, 1941.

548

George Rex Frye, of Detroit, Mich. (Swan, Frye & Hardesty, of Detroit, Mich., of counsel), for appellant.

Joseph W. Milburn, of Washington, D. C., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office reversing the decision of the Examiner of Interferences awarding priority of invention of the subject matter defined in the two counts in issue to appellant, Walter S. Saunders.

The interference is between appellant's application No. 2,249, filed January 17, 1935, and appellee's application No. 756,296, filed December 6, 1934.

Appellant is the junior party, and the burden was upon him to establish priority of invention by a preponderance of the evidence.

The invention in issue relates to adjustable sliding seat mountings, referred to in the record as "seat adjusters," for use on automobiles. Such seat adjusters are commonly used in association with the front seats of automobiles to permit ready adjustment of the seat to a position convenient for the driver.

The invention in issue is sufficiently defined in the involved counts which read:

"1. In an adjustable seat including a supporting structure and a seat structure, means movably mounting said seat structure on said supporting structure including spaced downwardly opening channel-shaped members secured to said seat structure, each having registering openings in the opposite side walls thereof, and spaced rails secured to said supporting structure and having portions thereof projecting into a respective channel member, said portions having latch engaging means therein, anti-friction means for slidably supporting said channel shaped members on said rails, and latch mechanism extending across the space between said channel members and mounted in said registering openings

for movement transversely of said seat structure to engage with the latch engaging means of said rails for latching said seat in selected positions of relative sliding adjustment.

"2. A sliding seat mounting comprising a track member adapted to be secured to a floor and a slide member adapted to be secured to the bottom of a seat, said track being formed at its top with oppositely directed longitudinal flanges providing a bearing and guiding surface, one of said flanges having a longitudinal row of notches, said slide being of inverted channel-shaped cross-section and having inturned guide portions on the side walls engaging the flanges of said track, bearing means between said track and slide spacing the same from each other, a pair of registering openings in the side walls of said slide aligned transversely of the space between said track and said slide, a latch bar extending across the space and movably supported in said openings and manually operated means for moving said latch bar into and out of engagement with selected ones of said notches."

It will be observed that count 2 defines an adjustable sliding seat mounting comprising a track member adapted to be secured to the floor of the automobile, a slide member adapted to be secured to the bottom of the seat, bearing means between the track member and the slide member, latching means for releasably latching the seat in adjusted positions, and manually operated means for actuating the latch mechanism; whereas, count 1 includes two track members secured to the floor, two channel-shaped members secured to the seat, and "latch mechanism extending across the space between" the channel-shaped members. It will also be observed that count 2 is narrower than count 1 in that it more specifically defines the track member, slide member, and latch mechanism, and also calls for an element—manually operable means for actuating the latch mechanism—not specified in count 1.

The involved interference is a consolidation of two interferences—Nos. 72,345 and 73,947. Count 1 of the involved interference was the single count in issue in interference No. 73,947, and involved count 2 was the single count in issue in interference No. 72,345.

Interference No. 72,345 was declared March 12, 1936, between the applications of the parties here involved—Saunders and Browne—and a third party, Donald E. Crabb. No motions were presented during the motion period by any of the parties. Evidence was submitted by the parties Saunders and Browne, but the party Crabb submitted no evidence. Crabb, therefore, was confined to the filing date of his application there involved—November 7, 1934—for conception and constructive reduction to practice.

On July 21, 1937, the Examiner of Interferences held on the evidence submitted that the party Saunders had established that he conceived the invention defined by the count there in issue (count 2 of the involved interference) on August 12, 1933, and had actually reduced it to practice on February 15, 1934; that the party Browne had established that he conceived the invention "at least as early as May 31, 1933," and had actually reduced it to practice on March 24, 1934; and that, although the party Browne was the first to conceive the invention, he was the last to reduce it to practice, and as he had failed to establish that he was diligent in reducing the invention to practice from immediately prior to the time the party Saunders entered the field—August 12, 1933—until he, Browne, had reduced the invention to practice (March 24, 1934), the party Saunders was entitled to an award of priority of invention.

On February 18, 1937, after the submission of the evidence in interference No. 72,345, but before the final hearing before the Examiner of Interferences in that case, another interference—No. 73,947—was declared between the applications of the parties, Saunders, Browne, and Crabb, involved in interference No. 72,345, and Arthur A. Buchner. On July 30, 1937, before the time had expired for the taking of an appeal by the party Browne from the decision of the Examiner of Interferences in interference No. 72,345, the party Saunders moved to dissolve the newly declared interference—No. 73,947—as to the parties Browne and Crabb, claiming that the count in that interference (involved count 1) was broader than the count in interference No. 72,345 (involved count 2), and that as he, Saunders, was the "winning party" in interference No. 72,345, and as none of the parties to that interference had moved during the motion period to include as an issue therein the broad subject matter defined in the count in interference No. 73,947, the parties Browne and Crabb were estopped from making a claim in interference No.

73,947 corresponding to the broad count there in issue.

On August 10, 1937, the party Browne appealed to the Board of Appeals from the decision of the Examiner of Interferences in interference No. 72,345 awarding priority of invention to the party Saunders. Whether the party Crabb appealed from the examiner's decision in that interference does not appear from the record.

On August 11, 1937, the party Browne filed a motion in the Patent Office addressed to the Commissioner of Patents requesting that interference No. 72,345 be reopened for the submission of additional evidence, particularly the testimony of the party Crabb, who had not theretofore testified in the case. Among other things, it was stated in the motion that "Inasmuch as the same applications of the same parties to this interference are involved in another interference, No. 73,947, declared March 22, 1937 [the record, as hereinbefore noted, shows that that interference was declared February 18, 1937], including in addition the party Buchner and covering a single count containing subject matter akin to that of the count of the instant interference, the additional testimony requested by Browne could be taken at that time"; that is, at the time of the taking of testimony in the newly declared interference—No. 73,947.

In his decision of September 30, 1937, denying Browne's motion to take additional testimony, the Assistant Commissioner of Patents made no reference to the newly declared interference—No. 73,947. He stated, however, among other things, that: "It is deemed obvious that if Crabb's omission to take testimony afforded a ground for permitting petitioner to take additional testimony he should have moved promptly for permission to do so. Instead, however, *he waited until his own testimony had been adjudged insufficient to support an award of priority and then, at the expiration of the limit of appeal,* filed the present motion. Such procedure on the part of petitioner is deemed in the nature of experimental prosecution which cannot be permitted in view of the unnecessary burden which it places on this Office and the other parties to the interference." (Italics not quoted.)

On November 5, 1937, the party Browne filed a request for reconsideration of the decision of the assistant commissioner denying his motion to reopen interference No. 72,345 and again called the assistant commissioner's attention to the fact that a new interference—No. 73,947—had theretofore been declared between the applications of the parties in interference No. 72,-345 and that of Arthur A. Buchner, and stated that as it would be necessary to submit evidence in the newly declared interference, the reopening of interference No. 72,345 for the submission of additional evidence would not impose any unnecessary burden on the parties or on the tribunals of the Patent Office. The assistant commissioner's attention was there called to the fact that the party Buchner had "filed a formal abandonment of the subject matter in" interference No. 73,947.

It may be stated at this point that *on October 13, 1937,* the Examiner of Interferences, in accordance with rules 107 and 125 of the Rules of Practice in the United States Patent Office, entered judgment against the party Buchner, who had theretofore filed in the Patent Office a written abandonment of the invention defined by the single count in issue in interference No. 73,947—count 1 of the involved interference.

On November 22, 1937, the Primary Examiner denied the party Saunders' motion to dissolve interference No. 73,947, stating in his decision that, although the Examiner of Interferences had decided interference No. 72,345 in favor of the party Saunders, his decision was not final and in fact an appeal had then been taken therefrom to the Board of Appeals by the party Browne; that none of the parties in interference No. 72,345 had moved to add additional counts to that interference; that, therefore, "under normal circumstances" each would have been estopped "from moving for an additional contest on any issue which could have been decided in such interference"; that interference No. 73,947 was declared by the Primary Examiner owing to the fact that the party Buchner could make a claim corresponding to the count there in issue; that such action (the declaration of the interference) on the part of the Primary Examiner "removed any estoppel which might otherwise have existed as to that count" (citing In re Chase, 71 F.2d 178, 21 C.C.P. A., Patents, 1183); and that the fact that the party Buchner had theretofore been eliminated did not "warrant the dissolution of the interference without a consideration by the Examiner of Interferences."

On December 18, 1937, the Assistant Commissioner of Patents granted the mo-

tion of the party Browne to reopen interference No. 72,345 for the purpose of taking additional testimony, vacated the decision of the Examiner of Interferences awarding priority of invention to the party Saunders, and ordered that the interference be consolidated with interference No. 73,947. The assistant commissioner stated in his decision that neither Saunders nor Crabb opposed the party Browne's motion to reopen; that the party Browne has pointed out "that the applications here involved are also involved in companion interference No. 73,947 which originally *included a fourth party* [the party Buchner] *who has now been eliminated,* and that the times for taking testimony in that interference have not yet been reached"; that the reopening of the case would not impose any unnecessary burden on either the parties to the interference or the Patent Office; and that the request of the party Browne to reopen the interference appeared to be reasonable, owing to the fact that that interference "would as a matter of course be consolidated with interference No. 73,947." (Italics ours.)

Thereafter, on December 31, 1937, the party Browne's appeal in interference No. 72,345 was dismissed by the Board of Appeals, the board stating that its action was taken "in view of the decision of the First Assistant Commissioner, of December 18, 1937, vacating the decision from which appeal was taken."

On January 5, 1938, the Examiner of Interferences consolidated interferences Nos. 72,345 and 73,947, and stated that the consolidated interference should bear the number 73,947.

It appears from the record, therefore, that at the time (December 18, 1937) the Assistant Commissioner of Patents reopened interference No. 72,345, vacated the decision of the Examiner of Interferences awarding priority of invention of the subject matter defined in the single count there in issue (count 2 of the involved interference) to the party Saunders, and ordered that that interference be consolidated with interference No. 73,947, the party Buchner had been eliminated from interference No. 73,947, and that the parties and the applications involved in the latter interference were the same as those involved in interference No. 72,345.

The record in the involved consolidated interference contains the evidence introduced by the parties Browne and Saunders in interference No. 72,345, as well as additional evidence introduced by each of them. No evidence was submitted by the party Crabb, and he was, therefore, confined to the filing date of his application (November 7, 1934) for conception and constructive reduction to practice.

In his decision in the involved consolidated interference, the Examiner of Interferences stated that since there was no new evidence introduced relative to the party Saunders' motion to dissolve interference No. 73,947 on the ground of estoppel, he was precluded by rule 130 of the Rules of Practice in the United States Patent Office then in force from passing on that issue. The examiner reviewed the evidence in the case, and held that the party Saunders had established that he conceived the invention defined by the counts here in issue as early as August 1933, and had successfully reduced it to practice as early as December 1933; that the party Browne had established that he conceived the invention on May 31, 1933, and had successfully reduced it to practice on March 24, 1934; that the party Browne had failed to establish diligence in reducing the invention to practice during the critical period, and, accordingly, awarded priority of invention to the party Saunders.

The party Browne appealed to the Board of Appeals from the decision of the Examiner of Interferences. The party Crabb, however, took no appeal from that decision.

Relative to the doctrine of estoppel invoked by the party Saunders in his motion to dissolve interference No. 73,947, the Board of Appeals, in its decision, stated that none of the parties to the original interference, No. 72,345, had moved in that interference to include therein the subject matter of count 1 of the consolidated interference; that none of those parties was responsible for the declaration of interference No. 73,947; that the Primary Examiner had suggested to the parties the claim corresponding to involved count 1 (the single count in interference No. 73,947) after finding it allowable in the party Buchner's application, and declared interference No. 73,947; that the principles announced in the decisions of this court in the cases of Avery v. Chase, 101 F.2d 205, 26 C.C.P.A., Patents, 823, and Dirkes et al. v. Eitzen, 103 F.2d 520, 26 C.C.P.A., Patents, 1198 (apparently relied upon by counsel for the party Saun-

ders), were not applicable to the issues raised by the motion to dissolve, and held that the party Browne was not estopped to contest with the party Saunders priority of the invention defined in that count. The board reviewed the evidence submitted by the parties, and sustained the findings of the Examiner of Interferences that the party Saunders had established conception of the invention as early as August 1933 and successful reduction to practice as early as December of that year, and that the party Browne had established conception on May 31, 1933. The board held, however, that the party Browne had established that he reduced the invention to practice at least as early as September 21, 1933; that he was the first to conceive and the first to reduce to practice, and was, therefore, entitled to an award of priority of invention. The board also stated in its decision that, for the purpose of appeal, it had considered the question of diligence on the part of the party Browne and found that he was diligent in reducing the invention to practice "from August 1933 to March 1934," and, accordingly, awarded priority of invention to Browne.

That the practical utility of a seat adjuster embodying the involved invention could be ascertained only by attaching it to the front seat of an automobile and testing it under actual operating conditions of the automobile in order to ascertain whether it would withstand the strains and stresses incident to its use thereon, is not questioned here by either of the parties. Nor does either party to this interference question the correctness of the holdings of the tribunals of the Patent Office that appellant conceived the invention as early as August 1933 and successfully reduced it to practice in December of that year, and that appellee conceived the invention on May 31, 1933.

It is contended, however, by counsel for appellant, as it was before the tribunals of the Patent Office, that appellee is estopped from contesting in this interference the issue of priority of the invention defined in count 1, because, it is argued, none of the parties in interference No. 72,345, in which involved count 2 was the single count in issue, moved, during the motion period, in accordance with rule 109 of the Rules of Practice in the United States Patent Office, to include in that interference the broad subject matter of involved count 1; that appellant was the "winning party" in interference No. 72,345; and

that, therefore, he was the only party involved in that interference who was entitled to contest the issue of priority of the invention defined in count 1 with the party Buchner in interference No. 73,947.

As hereinbefore stated, at the time appellant filed his motion to dissolve interference No. 73,947 he had received a favorable decision from the Examiner of Interferences in interference No. 72,345, but the time for filing an appeal by appellee in that interference had not expired. Thereafter, appellee appealed from the examiner's decision to the Board of Appeals. Subsequently, the Assistant Commissioner of Patents, without objection by appellant, reopened interference No. 72,345 for the purpose of taking additional testimony, vacated the decision of the Examiner of Interferences, and ordered that that interference be consolidated with interference No. 73,947. It is evident, therefore, that appellant was not the "winning party" in interference No. 72,345. Furthermore, at the time the Primary Examiner declared interference No. 73,947, each of the parties in interference No. 72,345 was in precisely the same situation, each by failing to move during the motion period, in accordance with rule 109, supra, to bring into interference No. 72,345 the subject matter involved in interference No. 73,947, was thereafter estopped from bringing into the former interference the subject matter involved in the latter (In re Austin, 40 F.2d 756, 17 C.C.P.A., Patents, 1202; In re Shimer, 69 F.2d 556, 21 C.C.P.A., Patents, 979), and each, by failing to act in accordance with the provisions of rule 109, elected to abide by the final decision in interference No. 72,345, not only as to the subject matter there directly involved but also as to all common subject matter disclosed in their respective applications which might have been presented and the rights of the parties thereto determined in that interference. Accordingly, a final decision in interference No. 72,345 would have determined the rights of the parties both as to the subject matter there directly involved and the subject matter involved in interference No. 73,947. Blackford v. Wilder, 28 App.D.C. 535; Horine v. Wende, 29 App.D.C. 415; Carroll v. Hallwood, 31 App.D.C. 165; In re Marconi, 38 App.D.C. 286; New Departure Manufacturing Company v. Robinson, 39 App.D.C. 504; Cross v. Rusby, 42 App.D.C. 341; In re Cutler, 48 App.D.C. 444; In re Dement, 49 App.D.C. 261, 263 F. 813; In re Was-

serfallen, 54 App.D.C. 367, 298 F. 826; In re Ellis et al., 47 F.2d 963, 18 C.C.P.A., Patents, 1060; In re Brashares, 74 F.2d 751, 22 C.C.P.A., Patents, 873; E. I. Du Pont De Nemours & Co. v. Coe, 67 App.D. C. 42, 89 F.2d 679; Anderson v. Shaw, 87 F.2d 903, 24 C.C.P.A., Patents, 951; Avery v. Chase, supra. The Primary Examiner's declaration of interference No. 73,947 on his own motion does not make inapplicable the principles hereinbefore stated. Avery v. Chase, supra.

However, as hereinbefore noted, there had been no final decision in interference No. 72,345 while Arthur A. Buchner was a party to interference No. 73,947. Accordingly, both Saunders and Browne were proper parties· to interference No. 73,947, and each was entitled to contest *with* the *party Buchner* the issue of priority of invention of the subject matter of the count there involved. Had the party Buchner won interference No. 73,947, that would have ended the matter so far as the count there involved was ·concerned, but as he was eliminated from that interference prior to the time interference No. 72,345 was reopened and the decision of the Examiner of Interferences vacated, it would seem that instead of reopening the latter interference and consolidating it with interference No. 73,947, *for the reasons assigned by the Assistant Commissioner of Patents,* it would have been more in conformity with proper procedure had interference No. 73,947 been dissolved as to all of the parties remaining in the interference, in which event priority of invention of the subject matter there involved would have been determined by a final decision in interference No. 72,345. However, as that question was not raised in appellant's motion to dissolve interference No. 73,947 and as it has not been raised in this court by appellant's reasons of appeal, it is not before us for consideration.

We hold, therefore, that appellant's motion to dissolve for the reasons stated therein was properly denied.

The evidence which the Board of Appeals held established that appellee had reduced the invention to practice as early as September 21, 1933, and upon which counsel for appellee here rely as being sufficient to warrant the board's decision in that regard, consists of the testimony of appellee's witnesses Luther A. Menges and Donald E. Crabb (formerly a party in the interference), certain letters (exhibits K, K–1, K–2, K–4, K–5, K–6, K–7, K–8, K–9, K–10, O, P, P–4, P–5, P–6, P–7, P–8, P–9, P–10, P–11, P–12, and P–13) written by Crabb to appellee's assignee (the Mechanical Devices Corporation of America, located at Buffalo, New York), copies of so-called "report sheets" of the Chrysler Corporation (identified in the record as exhibits M, M–1, and M–2), and exhibit J, a physical exhibit, which, it was held by each of the tribunals of the Patent Office, embodies the invention here in issue.

It appears from the record that six devices corresponding to exhibit J were produced for appellee by the McCauley Metal Products Company in May 1933, and it is claimed here by counsel for appellee that exhibit J was tested and found to be successful by employees of the Chrysler Corporation during the summer and fall of 1933, and that a device similar thereto was tested and found to be successful by the witness Donald E. Crabb.

The witness Menges testified that he was employed in the engineering department of the Chrysler Corporation; that during the years 1933 and 1934 he was working in an experimental department where various devices were developed and tested; that a device similar to exhibit J was submitted to the department in which he was working by the Mechanical Devices Corporation; that he supervised the installation of such device on one of the Chrysler test cars, identified on exhibit M as car No. 468; that immediately after the device was installed and before the car was turned over to the .driver for test purposes, he tested the device and that it operated to adjust and lock the seat in different positions of adjustment; and that he again tested "the seat on which this seat adjuster was mounted after it had been through *some mileage test."* (Italics ours.) In reply to the following question: "And will you tell us, did the seat perform properly *in so far as the adjustment of it to different positions was concerned?"* he said: "To the best of my knowledge, yes." (Italics ours.) The witness identified exhibit M as being a copy of a record sheet in the experimental department of the Chrysler Corporation of body work performed on car No. 468 during the period from May 25, 1933, to August 3, 1933, and exhibits M–1 and M–2 as being similar records for car No. 478 from June 26, 1933 to August 1, 1933, as in-

dicated on exhibit M–1, and from December 20, 1933 to January 5, 1934, as indicated on exhibit M–2. The witness also stated that exhibits M, M–1, and M–2 showed the speedometer readings when devices were installed and when they were removed. His attention was called to the statement on exhibit M that, under date of July 8, 1933, appellee's seat adjuster was removed from car No. 468 "(To give the Experimental Adjuster by Mechanical Devices Corporation more mileage) (Pullar)," and was asked how that seat adjuster compared with appellee's exhibit J, and he replied: *"I do not recall."* (Italics ours.)

It may be stated at this point that it appears from exhibit M–1 that the seat adjuster removed from car No. 468 on July 8, 1933, was, on that date, installed on car No. 478.

On cross-examination the witness Menges stated that he did not know who had driven cars Nos. 468 and 478 while appellee's seat adjuster was being tested, and that the names appearing immediately below the items of interest here on exhibits M, M–1, and M–2 identified the men who had done the work mentioned or who were in charge of such work; that Mr. Pullar, whose name appears on those exhibits was a representative of the engineering department; that Mr. Thomas, whose name appears under the item dated December 21, 1933, "Removed special Seat Adjuster installed as per Mr. Menges" on exhibit M–2, was one of the Chrysler Corporation workmen; that tests were made on appellee's seat adjusters after September 21, 1933; that, although he had not seen them, the report sheets of those tests were at the Chrysler Corporation's "plant" (those report sheets were not introduced in evidence); that he could not recall the number of appellee's seat adjusters tested by the Chrysler Corporation, nor how they differed, if at all, in construction; that he *was not* in charge of the testing of appellee's seat adjusters *prior* to December 1933, but that he *was* in charge of the testing of appellee's exhibit J during the month of December; and that the "special Seat Adjuster," referred to on exhibit M–2 as having been removed on December 21, 1933, was the seat adjuster *installed on car No. 478 on July 8, 1933.*

It is a strange circumstance that, although the witness Menges testified that he was in charge of the testing of appellee's exhibit J during the month of December 1933 and that the exhibit was removed from the test car on the 21st day of that month, he was not asked to describe the condition of that seat adjuster at the time of its removal, nor was he asked to state whether or not it operated successfully.

It appears from the testimony of the witness Menges and from exhibits M and M–1, that a device similar in construction to exhibit J was installed on experimental car No. 468 on May 29, 1933; that it was removed on July 8, 1933, and, as stated on exhibit M over the name "Pullar," was placed on car No. 478 "to give the device more mileage"; and that at the time of its removal from car No. 468, according to the speedometer readings, it had been given a "mileage test" of 1,166 miles. So, it would seem that at that time Mr. Pullar, an engineer and apparently in charge of the test, who was not called as a witness, was not entirely satisfied with appellee's seat adjuster.

The only information to be obtained from exhibit M–1 is that appellee's seat adjuster formerly on car No. 468 was installed on car No. 478, at which time the speedometer mileage reading was 12,679, and that it was removed from that car at a speedometer mileage reading of 24,-266. The date of its removal is not stated on that exhibit.

It appears from exhibit M–2 that, under date of December 21, 1933, over the name "Thomas," a "special Seat Adjuster installed as per Mr. Menges" was removed from car No. 478.

It will be recalled that the special seat adjuster removed from car No. 478 on December 21, 1933, was stated by the witness Menges to be exhibit J, *although according to a notation appearing on a paper tag attached to the exhibit,* in handwriting unfamiliar to appellee and his witnesses Menges and Crabb, *exhibit J was "removed from car #478 8/12/33. To be replaced."* (Italics ours.) (Appellee testified that the tag had probably been attached to the exhibit by an employee of the Chrysler Corporation.)

There is nothing on exhibits M–1 and M–2 to indicate that exhibit J was ever again installed on car No. 478, nor is there anything of record, except the uncorroborated statement of the witness Menges, to indicate that it was removed

from that car on December 21, 1933. Furthermore, it appears from exhibit M–2 that the seat adjuster removed on that date was apparently removed at a speedometer mileage reading of 12,634, and there is nothing on the exhibit to indicate the mileage reading at the time it was installed. How exhibit J, which was removed from car No. 478 at a speedometer reading of 24,266 could have been thereafter installed on the same car at a mileage reading of 12,634 is not explained, nor is it explained why the paper tag bearing the notation "Removed from car #478" on August 12, 1933, is now attached to exhibit J if that exhibit was again attached to car No. 478 and tested thereon in December of that year.

In view of the fact that the witness Menges testified that, although he supervised the installation of appellee's seat adjuster which was similar to exhibit J on car No. 468, he could not recall how the seat adjuster which was removed from car No. 468 and installed on car No. 478 on July 8, 1933, compared with exhibit J, and in view of the other related circumstances, we are unable to hold that the uncorroborated testimony of that witness is sufficient to establish that the seat adjuster removed from car No. 478 on December 21, 1933, was either exhibit J or a device embodying the invention here involved.

It will be recalled that the witness Menges testified that after a device similar to exhibit J was installed on the front seat of car No. 468, and before the car was turned over to the driver for test purposes, he tested the device and found that it operated to adjust and lock the seat in different positions of adjustment. It is *not* contended here that that testimony of the witness Menges is sufficient to warrant a holding that the device was successfully reduced to practice. It *is contended* by counsel for appellee, however, that the testimony of the witness that he tested the seat adjuster "after it had been through *some mileage test*," and that *"to the best"* of *his "knowledge"* (he probably meant to the best of his recollection) the device performed properly "in so far as the adjustment of it to different positions was concerned" is sufficient to establish a successful reduction to practice. (Italics ours.)

The witness Menges did not state positively that the seat adjuster performed properly after it had been "through some mileage test," nor did he refer to the condition of the device at that time. When asked to state how far the car had been driven when he tested the device, the witness said that he did not recall the mileage, but that *it was probably over a thousand miles* "because they run a thousand miles in a day or two." Apparently the witness meant to be understood as saying that he operated the seat adjuster within a day or two after it was installed on car No. 468. It appears, however, from exhibit M that that seat adjuster had not been given any "mileage test" for at least two days after it was installed on car No. 468. It further appears from that exhibit that on June 12, two weeks after the seat adjuster was installed on car No. 468, it had received a "mileage test" of only 317 miles; that on June 16 it had received a "mileage test" of 943 miles; that on July 8, five weeks after it was installed, it had received a "mileage test" of only 1,166 miles; and that during the five-weeks period, from May 29 to July 8, it had received an average daily mileage test of approximately 41 miles. It is evident, therefore, that the witness was merely guessing when he stated that the car had probably been driven over a thousand miles when he tested the seat adjuster within a day or two after it was installed on car No. 468. Furthermore, it clearly appears from exhibit M that on July 8, 1933, after the seat adjuster had been given a mileage test of 1,166 miles on car No. 468, it was removed from that car and installed on car No. 478 for the purpose of giving it "more mileage," and it is evident that at that time Mr. Pullar, who apparently was in charge of testing the device, was not entirely satisfied with its performance. Accordingly, we are unable to hold that the uncorroborated testimony of the witness Menges is sufficient to establish a successful reduction to practice of either exhibit J or a device similar thereto.

It further appears from the record that appellee is a sales engineer in the employ of his assignee the Mechanical Devices Corporation of America, located at Buffalo, New York, and that the witness Donald E. Crabb, formerly a party to this interference, was also associated with appellee's assignee as a "commission salesman" during the year 1933 and until July 1934.

The witness Crabb testified that he submitted several of appellee's seat adjusters to the Chrysler Corporation for testing

purposes during the year 1933, and that he assisted in the installation of one of those devices in the spring of that year. However, he was unable to recall the structure of the device he helped to install. He did not testify that any of appellee's seat adjusters submitted by him to the Chrysler Corporation for testing purposes embodied the invention defined in the appealed counts. The witness identified the letters written by him to appellee's assignee during the period from May 1933 to February 1934. It is unnecessary that the contents of those letters be here fully set forth. It is sufficient to say that some of the letters refer to tests being made of seat adjusters by the Chrysler Corporation during the months of June, September, and November 1933. There is no statement in any of those letters that tests were being performed during the months of July, August, October, and December of that year.

In a letter, dated June 5, 1933 (exhibit K–1), Crabb wrote to appellee's assignee that the "outfit [not described]" then being tested by the Chrysler Corporation was "working pretty well." He further stated that "they [the Chrysler employees] only had about 800 miles on the job and want to run out a couple of thousand, which will be this week end, before making a further examination"; whereas, it appears from exhibit M that on June 12, 1933, seven days after exhibit K–1 was written, the seat adjuster on car No. 468 had apparently been tested for a distance of only 317 miles. In a letter dated June 30, 1933 (exhibit K–2), Crabb wrote to appellee's assignee that "Jack Pullar reports our seat adjuster [not described] still performing perfectly on the test job." In a letter dated September 21, 1933 (exhibit K–8), the date awarded appellee for successful reduction to practice by the Board of Appeals, Crabb wrote to appellee's assignee that the seat adjuster (not described) then being tested by the Chrysler Corporation was not satisfactory to Hottell, who apparently was in charge of the testing of that device. We quote from that exhibit as follows: "Regarding the 3/4″ ball tracks, he [Hottell] has not taken them off the job, but I insisted that we should have an opportunity to repair them with heavier top sections. * * * Hottell says he can't experiment further at this time, but he is far from the final authority." There is no reference in any of the Crabb letters to any other tests being made during September or October

1933. On November 6, 1933, Crabb stated in exhibit P that "The job [not described] is installed and is working beautifully. Menges is satisfied and will go to bat for us in the morning." (It will be recalled that the witness Menges testified that the adjuster removed from car No. 478 on December 21, 1933, was the one installed on that car on July 8 of that year. He did not refer in his testimony to the installation of any device on a test car in November 1933.)

It appears from exhibit P–1 that on October 16, 1933, Crabb wrote the Chrysler Corporation quoting prices on "variations of seat adjusting units." When asked whether the device referred to in that exhibit operated like the seat adjuster which was installed on a Chrysler car in May 1933—exhibit J—he said, "I couldn't say." He also stated that he could not be positive that it was not similar to exhibit J because "various samples" had been "submitted" to the Chrysler Corporation (for what purpose, he did not state). It further appears from the Crabb letters dated June 5, June 30, September 21, and November 6, 1933, exhibits K–1, K–2, K–8, and P, respectively, that some type or types of seat adjusters of appellee's assignee were being tested by the Chrysler Corporation. However, Crabb testified that he did not recall what type or types were referred to therein, and there is nothing of record to establish that they embodied the invention here involved.

Although the statements contained in the letters written by Crabb to appellee's assignee relative to reports alleged to have been made to Crabb regarding the operation of appellee's seat adjusters are clearly hearsay, their competency is not challenged here either in the reasons of appeal or in the brief of counsel for appellant. Accordingly, we have considered them as though properly admissible in evidence. See United States v. Toledo Museum of Art, 25 C.C.P. A., Customs, 373, 381, and the cases of Diaz v. United States, 223 U.S. 442, 32 S. Ct. 250, 56 L.Ed. 500, Ann.Cas.1913C, 1138, and Spiller v. Atchison, Topeka & Santa Fe Railway Company, 253 U.S. 117, 40 S. Ct. 466, 64 L.Ed. 810, therein cited.

In view of the fact that the Chrysler Corporation kept records of the installation and removal of appellee's seat adjuster (exhibit J) in their test cars (Nos. 468 and 478) during May, June, and July 1933, it is fair to presume that had any of appellee's

seat adjusters been installed in any of the Chrysler Corporation cars for test purposes during the months of September, October, November, and December 1933, the Chrysler Corporation records would have disclosed such fact. However, with the exception of a report sheet for December showing the removal of a special seat adjuster "installed as per Mr. Menges," which seat adjuster the witness Menges stated, as hereinbefore noted, was exhibit J, no such report sheets were introduced in evidence. Nor does the witness Menges or any other of appellee's witnesses corroborate any of the statements contained in the Crabb letters that any of appellee's assignee's seat adjusters were being tested by the Chrysler Corporation after the removal of exhibit J from car No. 478 on August 12, 1933, except the testimony of the witness Menges regarding the removal of what he stated was exhibit J on December 21, 1933.

The witness Crabb testified that, with the exception of some changes made by him in the "latch construction," he installed a seat adjuster similar to exhibit J on the front seat of his own car sometime in June 1933, and that he operated the device on his car several times a day over a period of about three months. We quote from the testimony of the witness regarding the performance of that seat adjuster as follows:

"Q. 82. How did it perform from the standpoint of operation? A. It required a lot of repair work to keep the tracks on my own car in operating condition.

"Q. 83. Would it adjust the seat as required of it at such times as you wanted to adjust the seat? A. As I recall, the tracks were very loose, and required quite a bit of tinkering to get them to remain in locked position."

Obviously, that testimony, which is not inconsistent with the statements contained in the Crabb letters, is insufficient to warrant a holding that a seat adjuster embodying the involved invention was successfully reduced to practice.

In his letters of October 28, October 31, November 6, November 8, and November 10, 1933, exhibits P–5, P–6, P, P–7, and P–8, respectively, Crabb referred to seat adjusters for the Ford Motor Company. When asked as to whether those seat adjusters were similar in construction to appellee's exhibit J–3, a device embodying the involved invention and similar to a seat adjuster sold to the Ford Motor Company on March 24, 1934 (the date awarded appellee by the Examiner of Interferences for reduction to practice), the witness stated that he did not recall the precise construction of the devices referred to in those letters, but that to the best of his recollection it was in the early part of January 1934 when he submitted a seat adjuster to the Ford Motor Company similar in construction to appellee's exhibit J–3.

There is no evidence of record as to what tests, if any, were given the seat adjusters sold to the Ford Motor Company in March 1934, except the testimony of appellee Browne that he tested such a devise in the Ford Motor Company's factory at Buffalo, New York, sometime, apparently in the winter of 1934, although he did not state when.

It is evident from what has been said that the evidence of record is wholly insufficient to establish that appellee reduced the involved invention to practice prior to March 1934, or that he was diligent in reducing the invention to practice during the critical period from August to the date awarded appellant for successful reduction to practice—December 1933.

We must hold, therefore, that although appellee was the first to conceive the involved invention, he was the last to reduce it to practice, and that as he was not diligent during the critical period, he is not entitled to an award of priority of invention.

We may say in conclusion that, although it appears from the testimony of the witness Menges that at least some of the employees of the Chrysler Corporation who either had charge of the testing of appellee's seat adjusters or actually tested them were in the employ of the Chrysler Corporation in Detroit, Michigan, at the time the testimony of the witnesses Menges and Crabb was taken in that city, they were not called to testify and no explanation is offered by appellee as to why they were not.

We are of opinion, as was the Examiner of Interferences, that appellant is entitled to an award of priority of the invention defined in the counts in issue.

For the reasons stated, the decision of the Board of Appeals reversing the decision of the Examiner of Interferences and

awarding priority of the involved invention to appellee, is reversed.

Reversed.

GARRETT, Presiding Judge (specially concurring).

As indicated by my concurrence in the dissenting opinion of Judge Bland in the case of Avery v. Chase, 26 C.C.P.A., Patents, 823, 836, 101 F.2d 205, I am in general agreement with his views respecting the so-called doctrine of estoppel in patent proceedings, and the views which he here expresses upon that subject are in harmony with those there expressed by him, and I again concur in such views.

While I do not regard the discussion of estoppel as being essential to the decision, I realize the case was presented to us in a manner which led the majority to think otherwise, and I make no criticism of their action in that respect. I concur in the conclusion reached upon the merits.

BLAND, Associate Judge (specially concurring).

I concur in the conclusion reached by the majority. I write a separate opinion only for the purpose of calling attention to certain aspects of the so-called estoppel issue therein decided. My views and those of my associate, Presiding Judge GARRETT, on the doctrine of estoppel in general as applying to the Patent Office were expressed at some length in Avery v. Chase, 101 F.2d 205, 26 C.C.P.A., Patents, 823, and Dirkes et al. v. Eitzen, 103 F.2d 520, 26 C.C.P.A., Patents 1198. I also expressed my individual views on another phase of the doctrine in Re Rhodes, 80 F. 2d 525, 23 C.C.P.A., Patents, 816.

The doctrine of estoppel to which reference is here made was, to the best of my knowledge, first applied in Patent Office matters in Blackford v. Wilder, 28 App. D.C. 535, by the Court of Appeals of the District of Columbia (now the United States Court of Appeals for the District of Columbia). It was there said: " * * * Applying the well-settled principle of estoppel by judgment, before stated, it follows inevitably that the final decision in the first interference is conclusive, unless it can be made to appear that the question upon which the determination of the second case rests is one that neither was nor could have been presented and determined in the first case."

The doctrine applied there was on old one—legal estoppel, arising from matter of record (Black's Law Dictionary, Third Edition, page 688)—and the novelty of the decision was that it made the doctrine apply to claims of a losing party in a Patent Office interference proceeding. The decision was sound and has been approved many, many times. It did nothing more than apply the old and well-known doctrine of estoppel based upon res judicata.

In addition to the so-called legal estoppel arising from res judicata, the doctrine of estoppel in pais is an old one, having been frequently applied by the courts long before application was made of it to patent matters. The Supreme Court of the United States in Dickerson v. Colgrove, 100 U.S. 578, 580, 25 L.Ed. 618, commented on this doctrine as follows: "The estoppel here relied upon is known as an equitable estoppel, or estoppel in pais. The law upon the subject is well settled. The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both. This remedy is always so applied as to promote the ends of justice. It is available only for protection, and cannot be used as a weapon of assault. It accomplishes that which ought to be done between man and man, and is not permitted to go beyond this limit. * * *"

This is the true doctrine of equitable estoppel applied by law and equity courts, but it should never be applied in patent matters unless the fundamental elements on which such equitable estoppel is based are present. The aforesaid legal estoppel, based upon res judicata, and estoppel in pais are the doctrines which seem to be now followed by the United States Court of Appeals for the District of Columbia. See International Cellucotton Products Co. v. Coe, 66 App.D.C. 248, 85 F.2d 869, and American Cyanamid Co. v. Coe, 70 App. D.C. 330, 106 F.2d 851.

Subsequent to the decision in the case of Blackford v. Wilder, supra, the Patent Office by rule, now 109, provided that a party involved in an interference case *may* bring forward other applications involving any other pertinent common patentable

subject matter which existed between any of the parties to the interference. Presumptively he was expected to bring forward matters which could be adjudicated in that interference. It was held, under such circumstances, by the United States Court of Appeals for the District of Columbia and this court that his failure to do so resulted in estoppel against his later making claims to said subject matter. Later, this court went further and held that even though the issue could not have been adjudicated in the interference in which he was engaged, and even though there was no final adjudication therein, and even though the claims embraced in the issue stood rejected, he must, nevertheless, bring it forward in order that a separate interference might be set up between himself and any one of the parties engaged in the interference, and if he failed to do so, he was, by some kind of estoppel, barred from having the claims. It is too obvious for comment that in the latter case neither of the doctrines above referred to could possibly apply.

This court in Re Chase, 71 F.2d 178, 21 C.C.P.A., Patents, 1183, and In re Long, 83 F.2d 458, 23 C.C.P.A., Patents, 1078, took the position that under the facts of those cases no ground of estoppel existed. In the Chase case the claims which Chase was held to be estopped from obtaining could not have been adjudicated in the interference in which he was engaged, and a separate interference had to be set up in order to give an opportunity for him to contest with another. The second interference was set up by the examiner and Chase came forward and was obviously able (as he was later) to clearly show his first inventorship (in Avery v. Chase, Avery admitted he was not the first inventor) and this court, in Re Chase, supra, said Chase was not estopped. In other words, res judicata did not apply because the claims could not have been adjudicated in that interference. Estoppel in pais did not apply because Chase was guilty of no conduct to which the doctrine was applicable, and other essential facts for the application of the doctrine were absent. There was no final decision in the first interference.

However, in Avery v. Chase, supra, which involved the claims allowed to Chase in the aforementioned In re Chase case, the majority of this court reversed this court's original holding in the Chase case and held that he was estopped, thus departing from the doctrine of estoppel by reason of res judicata and estoppel in pais, and proceeded down the perilous road of applying a doctrine of estoppel (whether regarded as equitable estoppel or not, I don't know) whenever an interference party failed to bring forward a claim, even though he was obviously the first inventor and even though the claim could not have been adjudicated therein, and even though he did everything reasonably expected of him to do in order to prove his priority.

I have heretofore had occasion to mention, in substance, the fact that the doctrine which is most easily extended to an absurdity is one which should not have been applied in the first place. In Dirkes v. Eitzen, supra (and I notice that the majority does not cite it as authority for anything it has held or holds here), the full force and evil effect of the unnecessary and unjustifiable extension of a doubtful doctrine is disclosed in its fullest. There the majority held that Eitzen was estopped from bringing forward a claim which, during the motion period in the interference, stood unallowed to him, and he had taken appeal from the disallowance thereof and on the appeal won a holding that the claim was patentable to him. The examiner, having been reversed on the allowance of the claim, properly declared an interference to give Eitzen the opportunity to contest with his adversary. Upon motion to dissolve, the Patent Office held that he was not estopped, evidently upon the theory that the claim was not patentable subject matter upon which adjudication of priority could have been had. This court reversed the Patent Office and held, in substance, that Eitzen should have brought forward the claim notwithstanding the said disallowance and pending appeal. It is obvious that res judicata did not apply. There was no conduct that made applicable the doctrine of estoppel in pais, and so the remaining possible reason for applying the so-called estoppel was that he had simply failed to bring forward during the motion period a claim which at that time was held by the Patent Office to be unallowable to him and concerning which obviously no adjudication as to priority could have been made in the interference involved.

Right here I think it proper to say, and the thought is not new with me, that outside of estoppel based upon res judicata

and estoppel in pais, both of which doctrines are sound and properly applicable to patent matters, all other cases which involve the doctrine of so-called estoppel do nothing more than to sanction the imposition of a "bar" against one claiming that he is the first inventor. I say this notwithstanding the fact that in many of the latter type of cases attempt was made to bring them within the prescribed limits of the first two well-known doctrines. I have no quarrel with true estoppel and if Congress imposes a "bar" as a penalty against the first inventor "in the interest of orderly Patent Office procedure," the Patent Office and the courts would find justification in penalizing the first inventor and there would result no confusing uncertainty such as now exists. See Meigs, Time the Essence of Patent Law, p. 146; Journal of the Patent Office Society, Volume XXII, page 512. It is my view, after mature consideration, that court-made bars which are strangers to law and equity should rarely, if ever, be imposed, and if imposed it should not result in giving the second or subsequent inventor the disputed subject matter.

Now, to the instant case. In the first place, I see no reason for deciding the so-called estoppel issue in this case inasmuch as the court holds against appellee on the merits. But, if it evidences a disposition to make exceptions to what I regard, and I say it respectfully, as the said loose applications of the doctrine of estoppel, I must give my approval to this exception. Of course, in the instant case, Browne is not estopped from claiming the subject matter of the counts involved under the doctrine of res judicata or estoppel in pais. If the decision in the first interference had been final, both parties were equally estopped after the expiration of the motion period in the first interference because the subject matter could have been adjudicated in that interference, and since under the doctrine of estoppel by res judicata all things that could have been adjudicated must be regarded as adjudicated. Obviously, since there was nothing finally adjudicated, res judicata doesn't apply. Browne did nothing to the disadvantage of his adversary, by failing to claim, any more than his adversary did to him, and so estoppel in pais does not apply, but (and here's the point to be emphasized) he failed to comply with rule 109 during the motion period. As I understand the previous decisions of the majority, they are to the effect that in the interest of orderly procedure and to avoid multiplicity of litigation, if one fails during the motion period to assert a claim, regardless of whether it could have been adjudicated in that interference or not, and regardless of whether there was or was not a final decision, he is thereafter estopped from claiming against his former adversary the subject matter which he failed to bring forward. It is my understanding that it is the practice of the Patent Office to give to parties invoking the so-called estoppel the subject matter of the issue in controversy.

The point I seek to make is that if the prior decisions of the majority are correct, estoppel *does* apply to Browne. By getting into another interference in which there was a third party who quickly withdrew, under the instant decision of the majority, Browne avoids the application of estoppel, although the majority says that at one time he stood estopped.

The majority has not considered a related estoppel doctrine which is estoppel against estoppel, i.e., estoppel from raising the question of estoppel. See 21 Corpus Juris 1139. Quaere: Since Saunders did the same thing Browne did, should he be held estopped from raising the question of estoppel against Browne? Since I don't think any kind of estoppel or bar applies to Browne, I will not pursue this inquiry.

As I read the majority opinion, it holds that although the instant issue could have been adjudicated in the first interference, it was not adjudicated since there was no final decision. This suggests that the holding is based upon the correct premise that the elements of estoppel by res judicata are not present. It is clear that the conduct of the parties lacks a number of elements to make applicable the doctrine of estoppel in pais. It is to be noted that they followed the suggestion of the Patent Office and contested priority in the interference set up for the purpose. This last fact, and the lack of finality of decision in the first interference, were present in Re Chase, supra.

To hold, as I think the majority does hold, that Browne is not estopped from claiming the instant subject matter upon the ground that he failed to bring forward under rule 109 the disputed claims at a time when and place where the issue might have been adjudicated, merely be-

cause there was no final decision in the first interference, is to, in effect, reverse certain decisions of this court—and I am in favor of reversing some of them—although in some of the decisions which should be reversed I concurred, I regret to say. In Re Alexanderson, 69 F.2d 541, 21 C.C.P.A., Patents, 983, Alexanderson was estopped from obtaining claims because he failed to bring forward the involved subject matter in an interference in which he was engaged, although that interference did not go to decision. In Avery v. Chase, supra, the majority held Chase estopped, although the first interference was dissolved without decision, and another interference was set up for the purpose of giving him the right to prove priority, and was conducted during the period before the first interference was dissolved. In that case the majority decision did not overlook the fact that there was no final decision in the first interference, for it said [101 F.2d 208]: "We think it clearly appears from the record that interference No. 60,503 was initiated by the Primary Examiner. In view of our conclusion, we do not find it necessary to decide whether interference No. 57,166 had been terminated by dissolution at the time interference No. 60,503 was declared, but we shall assume, as appellee contends, that it had not been terminated."

In Re Austin, 40 F.2d 756, 17 C.C.P.A., Patents, 1202, there was no finality of decision in the first interference, and this court in Avery v. Chase, supra, referring to said Austin case, said:

"* * * While said interference was pending [in the Austin case], but long after the motion period under rule 109 of the Rules of the United States Patent Office had expired, the said common assignee moved that the interference be reformed by admitting thereto the sole application of Austin. In connection with said motion an affidavit was presented in behalf of the common assignee setting forth reasons why said motion was not made within the motion period. The Patent Office tribunals denied said motion, and in an ex parte prosecution by Austin the matter came before us. We held that, the common assignee having failed to move within the motion period to admit the Austin application, Austin and his assignee were estopped from making claims which might have been adjudicated in that interference. In our decision we stated, 40 F.2d 759:

"'* * * Furthermore, if a party to an interference fails to comply with the rules of the Patent Office relative to the presentation of such claims, it is thereafter estopped from presenting them as a basis for another interference between the same parties. (Citing cases.)

* * *

"'It is true, as argued by counsel for appellant, that, at the time the common assignee moved to reform interference No. 51235 by admitting appellant's application as to counts 1 and 2 and other claims, the question of priority had not been determined; whereas, in the cases hereinbefore referred to, the issues of priority had been decided. However, the principle announced in the cited cases is applicable here, and, if the rules of the Patent Office are to be given any force and effect, this is a proper case for their application, otherwise, the common assignee of several applications could subject an applicant involved in an interference with one of its applications to prolonged, expensive, and vexatious litigation.'

"It will be noted that in this [Austin] case estoppel was based wholly upon failure of appellant to act within the motion period provided by rule 109. The interference had not been terminated when it was sought to add the Austin application to the interference, so that estoppel under the doctrine of res adjudicata was not involved. * * *"

Also in Avery v. Chase, supra, is found the following: "Attention, however, is called to the fact that Shimer [referring to the case of In re Shimer, 69 F.2d 556, 21 C.C.P.A., Patents, 979] sought the interference while the original interference was pending, and that it was held that he was estopped from making the involved claims solely because of his failure to seek an interference before the expiration of the motion period under rule 109."

Attention might be called to the fact that the majority in the instant case has emphasized that each of the parties had the right to contest priority with Buchner in the second interference, and its holding is to the effect that appellee should not be estopped from claiming what he had a right to contest with the third party. The difficulty with that position is that it is not here questioned that Browne is not estopped from claiming it as against Buchner, but Buchner is out of the case, and the majority holds that Browne is not estopped

from claiming it as against the appellant Saunders, notwithstanding the fact that when Browne had the opportunity of bringing his claim forward and litigating it with Saunders, he failed to bring forward his common patentable subject matter under rule 109. Under the prior holdings of the majority, unless estoppel against estoppel is applied, there is more reason to estop or bar Browne than there was to estop either Eitzen or Chase. But, notwithstanding the force of the prior decisions relating to estoppel, I agree with the majority that it should not be held that Browne is estopped or barred, and, therefore, I concur in the conclusion reached by the majority that Browne, upon the merits of the case, did not show that he was the first inventor in law.